**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

**REVEREND KENNETH E. FAIRLEY, SENIOR, et al.**          **PLAINTIFFS**

**v.**                                                              **CIVIL ACTION # 2:06cv167-KS-MTP**

**HATTIESBURG, MISSISSIPPI, et al.**                        **DEFENDANTS**

# I. INTRODUCTION

In this lawsuit, a group of African-American residents of the City of Hattiesburg challenge the City's redistricting and apportionment procedures under the National Voting Rights Act of 1965 (hereinafter "the Act"). The residents claim that the City violates the Act by diluting the voting strength of minority citizens and disrupting their ability to elect representatives of their choice. Specifically, the residents claim that by including dormitory students that reside on college campuses in the apportionment base, the City creates one underpopulated majority-white ward, while simultaneously creating two overpopulated majority-black wards. According to the Plaintiffs, the result is that minority voters are unable to select the representatives that they would be able to elect were it not for the City's illegal apportionment procedures.

But as the Court more fully articulates below, the Plaintiffs cannot establish a *prima facie* violation of the Act because they failed to show that an additional majority-African-American ward can be drawn that satisfies the traditional redistricting criteria under the *Gingles* analysis. Moreover, even if each of the *Gingles* preconditions were satisfied, the totality of the circumstances fails to prove that the African-American community in the City is deprived of an equal opportunity to participate in the City's political processes. Finally, because the overall

deviation between the ideal ward sizes and actual size of the City's wards is under 10%, the City's plan does not violate the one person, one vote principle. And since no showing of bad faith or arbitrariness was presented by the Plaintiffs to prove that the plan was discriminatory, even if it were numerically sound, the Plaintiffs are unable to show that the City violated the one person, one vote principle. Because neither theory of relief was supported by the facts, and no violation of law was established, the Plaintiffs' Complaint for relief should be **denied**.

Based on this reasoning, the Court adopts the following findings of fact[1] and conclusions of law, and finds as follows:

## II. FINDINGS OF FACT

**I. Background**

1. The City of Hattiesburg (hereinafter "the City") is a municipal corporation situated in Forrest and Lamar counties in southern Mississippi.

2. The City employs the mayor-council form of government as identified by Mississippi Code Annotated § 21-8-1.

3. The legislative power of the City is exercised by a municipal council pursuant to Mississippi Code Annotated § 21-8-9.

4. The Hattiesburg City Council is divided into five different wards. The geographical boundaries of the wards are established pursuant to Mississippi Code Annotated § 21-8-7, which requires the City to place an equal number of citizens in each of the City's wards. The City contains a total of 14 voting precincts.

5. The 2000 decennial census reported a total population for the City of 44,779 persons. This included 22,365 white or Caucasian (hereinafter "white") residents, 21,200 black or African-American (hereinafter "African-American") residents, and 1,214 residents self-identified as other racial groups. White residents comprised 49.94% of the City's total population, while African-American residents comprised 47.3% of the City's total

---

[1] The Court also reincorporates the factual findings detailed in the Pretrial Order, only some of which are repeated in this Order for emphasis. *See* Pretrial Order [Doc. # 42] (April 7, 2008).

population.

6. The 2000 decennial census reported a total voting-age population for the City of 35,141 persons. This included 19,847 white residents of voting age, 14,375 African-American residents of voting age, and 919 residents of voting age self-identified as other racial groups. White residents comprised 56.5% of the City's voting-age population, while African-American residents comprised 40.9% of the City's voting-age population.

7. On May 7, 2002, the Hattiesburg City Council adopted Redistricting Plan 1A. The motion to adopt the plan was supported by four councilpersons, including Betsey M. Rowell, Carter Carroll, C.E. "Red" Bailey, and Henry Naylor. The plan was opposed by councilperson Deborah Delgado. The plan was supported by the three white councilpersons and one African-American councilperson, and was opposed by one African-American councilperson.

## II. 2001 Municipal Election

8. In the City's 2001 election, Johnny DuPree was elected city-wide as the first African-American mayor in the City's history. Facing a white incumbent, J. Ed Morgan, DuPree received 5,902 votes (53% of votes cast), while Morgan received 5,164 votes (46% of votes cast). Two independents running in the same race received a combined total of 89 votes (less than 1% of votes cast).

9. In the City's 2001 election, two councilpersons were elected unopposed, including councilperson Henry Naylor of Ward 5 and councilperson Carter Carroll of Ward 3. Councilpersons Deborah Denard Delgado of Ward 2, Betsey M. Rowell of Ward 1, and C.E. "Red" Bailey of Ward 4 each defeated a challenger.

10. In Ward 1, Republican Betsey M. Rowell received 644 votes (63% of votes cast) to defeat Democratic challenger Shronda Taylor, who received 359 votes (35% of votes cast).

11. In Ward 2, Democrat Deborah Denard Delgado received 1,738 votes (74% of votes cast) to defeat Independent challenger Kendra McGee, who received 506 votes (22% of votes cast).

12. In Ward 4, Independent C.E. "Red" Bailey received 1,972 votes (79% of votes cast) to defeat Republican challenger Karl Francis, who received 408 votes (16% of votes cast).

13. The City council elected in 2001 consisted of three white councilpersons and two African-American councilpersons.

## III. 2003 Annexation & Resulting Redistricting Plan

14. The City annexed additional land in 2003, increasing the City's population by 667 persons according to census block data. After annexation, the total population of the City rose to 45,446 persons.

15. Following annexation, the City had a total white population of 22,908 residents, or 50.4% of the total population. Of these residents, 20,320 were of voting-age, resulting in 56.9% of the City's voting-age population.

16. Following annexation, the City had a total African-American population of 21,301 residents, or 46.9% of the total population. Of these residents, 14,449 were of voting-age, resulting in 40.5% of the City's voting-age population.

17. On September 2, 2004, the United States Department of Justice pre-cleared the City's 2004 redistricting based on the annexation to extend Ward 3 and make other minor changes to the 2002 Redistricting Plan.

18. Pursuant to Mississippi Code Annotated § 21-8-7, the City is required to evenly divide the total population across the five separate wards.[2] Based on the 2003 annexation, the ideal ward size for the City would be 9,089 persons.

**IV. Demographics by Ward Under the Current Redistricting Plan**

19. The African-American population of the City is predominately located in City Wards 2 and 5.

20. Following the 2003 annexation, Ward 2 had a total population of 9,008 residents. The African-American voting-age population was 4,725 residents, which comprised 76.17% of the Ward's voting-age population. For the same period, Ward 2 had a white voting-age population of 1,382 residents, which comprised 22.28% of the Ward's voting-age population

21. Following the 2003 annexation, Ward 5 had a total population of 8,966 residents. The African-American voting-age population was 4,471 residents, which comprised 73.14% of the Ward's voting-age population. For the same period, Ward 5 had a white voting-age population of 1,582 residents, which comprised 25.88% of the Ward's voting-age population.

22. The white population of the City is predominately located in City Wards 1, 3, and 4.

---

[2] *See* Miss. Code. Ann. § 21-8-7 ("In designating the geographical boundaries of the wards, each ward shall contain, as nearly as possible, the population factor obtained by dividing the municipality's population as shown by the most recent decennial census by the number of wards into which the municipality is to be divided.")

23. Following the 2003 annexation, Ward 1 had a total population of 9,181 residents. The white voting-age population was 5,120 residents, which comprised 62.90% of the Ward's voting-age population. For the same period, Ward 1 had an African-American voting-age population of 2,682 residents, which comprised 32.94% of the Ward's voting-age population.

24. Following the 2003 annexation, Ward 3 had a total population of 9,363 residents. The white voting-age population was 6,527 residents, which comprised 84.94% of the Ward's voting-age population. For the same period, Ward 3 had an African-American voting-age population of 1,038 residents, which comprised 13.50% of the Ward's voting-age population.

25. Following the 2003 annexation, Ward 4 had a total population of 8,928 residents. The white voting-age population was 5,709 residents, which comprised 77.44% of the Ward's voting-age population. For the same period, Ward 4 had an African-American voting-age population of 1,533 residents, which comprised 20.79% of the Ward's voting-age population.

26. Comparing the actual ward size versus the ideal ward size across all five wards, the current plan has an overall deviation of 4.8%.

## V.  2005 Municipal Election

27. In the City's 2005 election, Mayor Johnny DuPree was reelected city-wide to a second term as mayor. DuPree received 7,331 votes (61% of votes cast), while his white Republican challenger received 4,704 votes (39% of votes cast).

28. In the City's 2005 election, each of the incumbent councilpersons were reelected. Councilpersons Henry Naylor of Ward 5, Carter Carroll of Ward 3, and Deborah Denard Delgado of Ward 2 each ran unopposed. Councilpersons Kim Bradley of Ward 1 and C.E. "Red" Bailey of Ward 4 each defeated a challenger.

29. In Ward 1, Republican Kim Bradley received 578 votes (61% of votes cast) to defeat Democratic challenger LaJuana Richardson, who received 377 votes (39% of votes cast).

30. In Ward 4, Independent C.E. "Red" Bailey received 1,112 votes (43% of votes cast) to defeat Democratic challenger C. Jerome Brown, who received 784 votes (31% of votes cast), as well as Republican challenger Andrew Ellard, who received 665 votes (26% of votes cast).

## VI.  Hattiesburg Universities and Student Population

31. Two universities are located within the City–William Carey University and the University of Southern Mississippi. Both universities offer on campus housing for students.

32. According to the 2000 census, 3,440 students reside in dormitories or group quarters within the City. This includes 2,062 white students and 1,369 African-American students.

33. According to the voting rolls for the City, at least 570 students that reside in dormitories with a University of Southern Mississippi address are registered to vote in the City.[3] Because of the number of students that reside off campus, it is impossible to determine the percentage of students at William Carey University or the University of Southern Mississippi that are registered to vote.

34. College students residing within the City are impacted by laws, regulations, and policies enforced by the City.

35. College students residing within the City pay taxes and other fees, either directly or indirectly, to the City.

36. College students residing within the City can and do vote in Hattiesburg municipal elections, and have also run for City offices in recent municipal elections.

## VII. Racial Bloc Voting and Racially Cohesive Voting Patterns

37. White residents of the City enjoy, on average, a significantly higher standard of living than African-American residents. According to 2000 census data, whites attain higher levels of education, have higher incomes, and are more likely to own telephones, automobiles, and their own homes in comparison with African-American residents of the City.

38. Racial bloc voting refers to the differences in candidate choice between voters of different groups. Racially polarized voting exists where there is a consistent correlation between the race of the voter and his voting pattern, that is, where African-American and white voters vote differently but as groups.

39. The City exhibited a clear pattern of substantial racial bloc voting in both the 2001 and 2005 municipal elections. In both contests, black voters were invariably cohesive in support of African-American candidates, and backed African-American candidates at the mathematical maximum. During the same elections, white voters were invariably

---

[3] Although this gives some indication of the number of students registered to vote, it does not include dormitory students that listed another (permanent) address when they registered to vote, or those students that live off campus who are also registered to vote in the City.

cohesive in support of white candidates, and united behind white candidates at close to the mathematical maximum.

## VIII. Illustrative Redistricting Plan

40. The Plaintiffs submitted the expert report and testimony of William Cooper. Cooper offered an illustrative plan to show that an additional majority-African-American ward could be drawn within the City. The plan offered by Cooper created the additional ward by excluding the dormitory population from William Carey University and the University of Southern Mississippi from the City's population base.

41. In their illustrative plan, the Plaintiffs made no attempt to separate non-resident students who reside in dorms from those students who are residents of the City. Therefore, the dormitory population excluded to create the third majority-African-American ward includes both residents of the City and non-residents.

42. The Plaintiffs offered no evidence or illustrative plans to demonstrate that three geographically compact, majority-African-American wards could be created without excluding the dormitory population from both universities. Consequently, there is no evidence in the record to establish that it is possible to create three majority-black wards that meet traditional redistricting criteria including compactness, contiguity, respect for communities of interest, compliance with the one person, one vote requirement, and the non-dilution of minority voting strength, without excluding the City's dormitory residents.

## IX. Evidence of Responsiveness to Minority Concerns

43. A recycling business and junkyard is located within Ward 2 in the City, a predominantly African-American ward. Councilperson Deborah Delgado testified that the property might be eligible for a grant from the Brownfield program of the Environmental Protection Agency. Councilperson Delgado testified that she felt that the City Council should have sought federal funding to clean up possible contamination at the site and to force the business to relocate outside of the City. She further testified that her efforts to seek federal funding and force a relocation were blocked by the three white members of the City Council.

44. Outside of Councilperson Delgado's opinion testimony, the Plaintiffs offered no evidence that the junkyard was a nuisance to local residents, or that it was responsible for any environmental contamination detrimental to local residents.

# III. CONCLUSIONS OF LAW

## Plaintiffs' Section 2 Claim

### I. Background

45.  The National Voting Rights Act of 1965 prohibits voting practices or procedures that discriminate on the basis of race, color, or membership in one of the language minority groups identified in the Act.[4]

46.  Practices that discriminate against minorities by diluting their voting strength and blocking their ability to elect the candidates they prefer can violate the Act.[5]

47.  The "right to 'undiluted' voting strength in Section 2 is a guarantee of equal opportunity in voting, ensuring that a minority group is not denied, on account of race, color, or language minority status, the opportunity to exercise an electoral power that is commensurate with its population in the relevant jurisdiction."[6]

48.  Vote dilution occurs when a class of citizens has "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[7]  A claim of vote dilution alleges that a municipality's challenged practice or procedure operates "to cancel out or minimize the voting strength" of a minority group.[8]

49.  To prevail on a claim of vote dilution under Section 2 of the Act,[9] the plaintiffs must meet

---

[4] *See* 42 U.S.C. § 1973 (2006).

[5] *See Hall v. Virginia,* 385 F.3d 421, 427 (4th Cir. 2004).

[6] *Id.* at 429.

[7] *See Rodriguez v. Bexar County, Tex.*, 385 F.3d 853, 859 (5th Cir. 2004) (quoting 42 U.S.C. § 1973 (2006)).

[8] *White v. Regester*, 412 U.S. 755, 765 (1973).

[9]  *See* 42 U.S.C. § 1973 (2006).  The pertinent portions of Section 2 state as follows:

  (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any state or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

  (b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is

certain threshold requirements, and then demonstrate that, under the totality of the circumstances, the political process they are challenging is not equally open to individuals of all races.[10]

50. The threshold requirements were first announced by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). The three *Gingles* factors, as the conditions have come to be known, are (1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) that the minority group is "politically cohesive;" and (3) that the "majority votes sufficiently as a block to enable it…usually to defeat the minority's preferred candidate."[11]

51. Satisfaction of these factors is a necessary but insufficient condition for succeeding on a Section 2 claim. The minority group must then offer evidence that, under the totality of the circumstances, its members have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice.[12]

52. Plaintiffs must show each of the *Gingles* preconditions by a preponderance of the evidence. Failure to satisfy any element results in dismissal of the claim.[13]

## II. Application of the *Gingles* Factors

53. In order to satisfy the first *Gingles* factor, the plaintiff must ordinarily show that members of the minority group constitute a majority of the population in a district.[14]

---

shown that the political processes leading to nomination or election in the State or political subdivisions are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

[10] *See NAACP v. Fordice*, 252 F.3d 361, 366 (5th Cir. 2001); *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1146 (5th Cir. 1993).

[11] *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986); *see League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006); *Growe v. Emison*, 507 U.S. 25, 40 (1993) (finding the three *Gingles* factors applicable to vote dilution claims in single-member districts).

[12] *LULAC*, 548 U.S. at 425.

[13] *Johnson v. De Grandy*, 512 U.S. 997, 1011-12 (1994).

[14] *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1117 n.7 (5th Cir. 1991) (*Westwego III*); *Overton v. City of Austin*, 871 F.2d 529, 535-36 (5th Cir. 1989).

54. For purposes of this calculation, the relevant population of a district should be limited by two factors: voting age and citizenship.[15] In other words, the minority group satisfies the numerosity element of the first *Gingles* factor if it can demonstrate that it constitutes a majority of the citizen voting-age population in a district.[16]

55. The first *Gingles* factor requires plaintiffs to establish "the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice."[17] That is, the plaintiff must introduce hypothetical examples showing that a single-member district with a minority voting-age majority can be drawn.[18]

56. The alternative district schemes presented by the plaintiff must also demonstrate the geographic compactness of the minority group. While the proposed lines do not have to be aesthetically pleasing, the shape of the proposed district relates to the compactness inquiry and must be considered by the court.[19] If proposed alternatives are purposefully drawn to avoid areas densely populated by whites and to bring in African-Americans from other communities that already have an African-American majority, then the court may question the minority group's compactness.[20]

57. In evaluating the compactness element, the court should take into account traditional districting principles such as maintaining communities of interest, preserving historic and

---

[15] *See LULAC v. Perry*, 548 U.S. 399, 429 (2006) (basing majority determination on citizen voting-age population "fits the language of Section 2 because only eligible voters affect a group's opportunity to elect candidates"); *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853 (5th Cir. 1999); *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997).

[16] However, figures on the total population may nevertheless be significant. Where the minority population in a proposed single-member district is sufficiently large, the court may rely on such figures as evidence that the minority voting population exceeds 50%. *See Westwego Citizens for Better Gov't v. City of Westwego,* 946 F.2d 1109, 1117 n.7 (5th Cir. 1991) (*Westwego III*); *Brewster v. Ham*, 876 F.2d 448, 452 (5th Cir. 1982).

[17] *See Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994); *LULAC*, 548 U.S. at 429.

[18] *See Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1151 n.6 (5th Cir. 1993). Section 2 seeks to ensure that minority groups have the "potential to elect" the candidates of their choice; it does not provide a guarantee that those candidates will be elected. *Westwego III*, 946 F.2d at 1117.

[19] *See Abrams v. Johnson*, 521 U.S. 74, 91-92 (1997); *Sensley v. Albritton*, 385 F.3d 591, 596 (5th Cir. 2004).

[20] *See Sensley*, 385 F.3d at 597.

          geographic boundaries, compactness, and contiguity.[21]  A proposed plan that fails to comply with principles of good districting, such as one that fragments existing neighborhoods and ignores natural boundaries, will be heavily scrutinized by the court.

58.      Although the Plaintiffs in this case did present an illustrative redistricting plan, their proposal was based solely on the exclusion of college students who reside in dormitories at William Carey University and the University of Southern Mississippi.  The Plaintiffs offered no plan demonstrating the ability to establish a third ward with a minority voting-age majority absent the exclusion of dormitory students.

59.      While it is permissible for the City to exclude non-resident college students from its apportionment base, as discussed *infra*, the City is not required to exclude all college students from its apportionment base, especially when it has no reliable method to distinguish between those that are and those that are not residents of the City.

60.      Because the City is not required to exclude college students from its apportionment base, it is under no obligation to exclude a subset of those same college students from the apportionment base because they reside on campus as opposed to off campus.

61.      As a matter of law, the Plaintiffs have failed to satisfy the first factor of the *Gingles* analysis.  Basing their entire illustrative plan on the arbitrary exclusion of a subset of students from the apportionment base, the Plaintiffs have not shown that it is possible to draw a third majority-African-American ward that meets the traditional redistricting criteria of compactness, contiguity, respect for communities of interest, compliance with the one person, one vote requirement, and the non-dilution of minority voting strength.

### III.  Additional *Gingles* Factors

62.      Plaintiffs typically attempt to establish the second and third *Gingles* factors with statistical evidence of racial polarization of the electorate.

63.      The degree of bloc voting that constitutes the threshold of legal significance under the Act varies from district to district, and a determination of whether racially polarized voting exists depends on an examination of a number of factors.[22]  However the Fifth

---

[21] *LULAC v. Perry*, 548 U.S. 399, 433 (2006) (citations omitted); *Washington v. Tensas Parish Sch. Bd.*, 819 F.2d 609, 612 (5th Cir. 1987) ("[I]n drawing constitutionally and statutorily acceptable districts, the court should adhere to considerations of 'compactness, contiguousness and the preservation of boundaries,' and the court should not post as its primary goal 'racially balanced representation.'").

[22] *Thornburg v. Gingles*, 478 U.S. 30, 55-56 (1986).

        Circuit has held that, to be legally significant, "racial polarization need only be the 'usual pattern for a significant proportion of voters.'"[23]

64.     One way to prove political cohesiveness is by showing that a significant number of minority group members usually vote for the same candidate.[24] While it may be supposed that minority candidates will be preferred by minority voters, plaintiffs must introduce evidence that the minority candidate is actually minority-preferred; however this burden is not strenuous, and may be satisfied by lay testimony or statistical evidence of racial bloc voting.[25]

65.     The statistical evidence submitted proves that the City exhibits both racial bloc voting and racially cohesive voting patterns at or near the mathematical maximum. Therefore, the Court finds that the Plaintiffs have conclusively established the second and third factors of the *Gingles* analysis.

## IV. Totality of the Circumstances

66.     If the three *Gingles* preconditions are established, the Court then considers whether, under the totality of the circumstances, the minority group is deprived of an equal opportunity to participate in the municipality's political process.

67.     Several factors, identified in the legislative history of Section 2, are relevant to the totality of the circumstances inquiry:

        a.     the history of voting-related discrimination in the State or political subdivision;

        b.     the extent to which voting in the elections of the State or political subdivision is racially polarized;

        c.     the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

        d.     the exclusion of members of the minority group from candidate slating processes;

---

[23] *Teague v. Attala County, Miss.*, 92 F.3d 283, 288 (5th Cir. 1996) (citing *Gingles*, 478 U.S. at 57).

[24] *See Jamison v. Tupelo, Miss.*, 471 F. Supp. 2d 706, 712 (N.D. Miss. 2007).

[25] *See Teague*, 92 F.3d at 289.

       e.       the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

       f.       the use of overt or subtle racial appeals in political campaigns;

       g.       the extent to which members of the minority group have been elected to public office in the jurisdiction;

       h.       the responsiveness of elected officials to the particularized needs of the minority community;

       i.       the tenuousness of the policy underlying the state or the political subdivision's use of the contested practice or structure; and

       j.       whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area.[26]

68. The Supreme Court has noted that the two most important factors in this totality analysis are the history of discrimination and the extent of racial polarization.[27]

69. Courts acknowledge that resolution of the elements of a vote dilution claim "'depends upon a searching practical evaluation of the past and present reality' and on a 'functional view of the political process.'"[28] Thus, no one factor is dispositive, and plaintiffs are not required to prove a majority of them to succeed on their claim.

70. The Fifth Circuit has refused to "endorse the view that the success of [African-American] candidates at polls necessarily forecloses the possibility of dilution of the [African-American] vote."[29]

---

[26] *LULAC v. Perry*, 548 U.S. 399, 426 (2006) (citing S. Rep. No. 97-417 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177).

[27] *See Thornburg v. Gingles*, 478 U.S. 30, 51 n.15 (1986); *see Westwego Citizens for Better Gov't v. City of Westwego,* 946 F.2d 1109, 1120 (5th Cir. 1991) (*Westwego III).*

[28] *Westwego III*, 946 F.2d at 1120 (citing *Gingles*, 478 U.S. at 45).

[29] *NAACP v. Fordice*, 252 F.3d 361, 369 (5th Cir. 2001) (citing *Zimmer v. McKeithen*, 485 F.2d 1297, 1307 (5th Cir. 1973)).

71. Responsiveness, while acknowledged as relevant by the Senate Report, is of limited significance in the overall scheme of a Section 2 claim.[30] Responsiveness is necessarily a subjective inquiry that depends on the particular circumstances of a political subdivision.[31] Evidence of unresponsiveness may include unwillingness to appoint African-Americans to county or municipal boards and committees, discriminatory patterns in paving roads, and a reluctance to address and remedy African-American complaints.[32]

72. The pertinent question to ask regarding proportionality is whether the challenged district "provid[es] political effectiveness in proportion to voting-age numbers."[33]

73. The Court finds that even if the Plaintiffs had established all three *Gingles* preconditions, based on the totality of the circumstances, the African-American population of the City is not deprived of an equal opportunity to participate in the political process in violation of Section 2 of the Act.

74. Like many communities throughout the southeastern United States, the City has endured a history of voting related discrimination by City officials up until the late 1960s. However, these discriminatory practices ceased long ago, and no evidence was submitted to prove official discrimination on the part of the City continues to exist.

75. In addition to this history of official discrimination, the evidence also established that the City exhibited extreme racial bloc voting and racially polarized voting patterns in each of the last two municipal elections.

76. Although African-American residents of the City generally have lower incomes and educational levels than other residents, there is no indication that this lower standard of living hinders their ability to participate effectively in the political process. The evidence

---

[30] S. Rep. No. 97-417 at 29 n.116; *see Clark v. Calhoun County, Miss.*, 88 F.3d 1393, 1400 (5th Cir. 1996); *Westwego III*, 946 F.2d at 1122.

[31] *See Clark*, 88 F.3d at 1400; S. Rep. No. 97-417 at 29 n.115 (noting responsiveness is less objective factor than others).

[32] *See Rogers v. Lodge*, 458 U.S. 613, 626 (1982); *see also Jones v. City of Lubbock*, 727 F.2d 364, 381-82 (5th Cir. 1984).

[33] *Johnson v. De Grandy*, 512 U.S. 997, 1014 (1994); *see LULAC v. Perry*, 548 U.S. 399, 437-38 (2006). However, the mere fact that the percentage of majority-minority districts mirrors the proportion of minority voters in the relevant population does not, on its own, indicate the absence of minority vote dilution. While proportionality may have probative value for the Court, it is but one factor to consider in the totality of the circumstances inquiry.

showed that African-American voters turnout to vote more frequently for City elections than do the City's white voters.

77. The only evidence of unresponsiveness to the minority community was limited to testimony about the Ward 2 junkyard, and consisted solely of the opinion of Councilperson Delgado. The Plaintiffs presented no other testimony to demonstrate systematic or persistent unresponsiveness to the needs of the African-American community.

78. Finally, both the elected and the appointed executive officials in the City reflect the proportional balance of voting strength between the different communities. As 40.7% of the voting-age population of the City, the ideal proportional representation of African-Americans on the City Council would be 2 out of 5 members, the current makeup of the council. Since 2001, the City has twice elected an African-American as mayor. And at least four of the eight departments in the City are or have recently been headed by African-American chairpersons or chiefs.

79. Combining each of the above factors, the Court finds that the Plaintiffs have failed to show that, under the totality of the circumstances, the African-American minority group is deprived of an equal opportunity to participate in the political process in the City.

## Plaintiffs' One Person, One Vote Claim

### I. Background

80. The Equal Protection clause guarantees the opportunity for equal participation by all voters in the election of local government officials.[34] Known as the "one person, one vote" rule, this provision ensures that the votes of each and every individual are weighed equally, irrespective of race or residency.

81. An ideal municipal apportionment scheme should distribute population equally across all wards. However, limited population variances are permitted, as long as they are unavoidable despite the city's best efforts to achieve an equal population distribution. Some deviation may be necessary to enable the political subdivision to pursue constitutionally permissible goals, like "maintain[ing] the integrity of various political subdivisions" and "provid[ing] for compact districts of contiguous territory."[35]

---

[34]*Avery v. Midland County*, *Tex.*, 390 U.S. 474, 480 (1963) (extending the one person, one vote requirement to local governments).

[35]*Reynolds v. Sims*, 377 U.S. 533, 578 (1964).

82. In general, an apportionment plan with a maximum population deviation under 10% falls within the category of permissible variances.[36] If population equality deviates more than 10%, the burden shifts to the political subdivision to prove that it had a legitimate reason for creating the discrepancy.[37] However, as the Supreme Court has noted, population deviations are not determinative: "In our view the problem does not lend itself to any such uniform formula ... [r]ather, the proper judicial approach is to ascertain whether ... there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination."[38]

83. Certainly, large discrepancies may indicate an impermissible apportionment plan, but if a political subdivision can demonstrate its districting decisions were based on legitimate considerations, courts will typically allow population inequality.[39]

## II. University Population

84. The Equal Protection Clause of the Constitution does not require a state to use as its apportionment base the total population figure derived from the federal census when drawing state legislative districts. Instead, the state may apportion districts based on total citizen population.

85. The Supreme Court has held that states are not "required to include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime in the apportionment base by which their legislators are distributed and against which

---

[36] *See Brown v. Thomson*, 462 U.S. 835, 842 (1983). *See also Cox v. Larios*, 542 U.S. 947, 949 (2004) (refusing to create a safeguard for population deviations of less than 10% within which districting decisions could be made for any reason whatsoever).

[37] *See Brown*, 462 U.S. at 842-43; *Moore v. Itawamba County, Miss.*, 431 F.3d 257, 259 (5th Cir. 2005) (recognizing that the 10% threshold functions primarily as a burden-shifting device in one person, one vote cases).

[38] *Roman v. Sincock*, 377 U.S. 695, 710 (1964).

[39] *See Brown*, 462 U.S. at 844; *Abate v. Mundt*, 403 U.S. 182, 187 (1972) (population deviations permissible so long as there is no "built-in bias tending to favor particular political interests or geographic areas").

compliance with the Equal Protection Clause is to be measured."[40] Exclusion of any such group "offends no constitutional bar" and will not elicit judicial interference.[41]

86. University students may be characterized as temporary residents of a municipality, and thus excluded from its apportionment base. The Fifth Circuit has upheld a county redistricting plan that omitted from its reapportionment base all non-resident students at the county's two colleges who were unmarried and resided in dormitories or fraternity houses on campus.[42] Similarly, a district court in Mississippi has permitted a city to exclude non-resident university students residing on campus from its apportionment calculations.[43]

87. The Court finds that the City's current redistricting plan does not violate the Equal Protection clause based on the one person, one vote principle. By permissibly including college students in its apportionment base, including those that reside on campus, the City has adopted a plan that results in an overall deviation of 4.8%, well within the recognized standard 10% threshold. As such, the Plaintiffs have failed to establish a *prima facie* case of violation of the one person, one vote principle by the City.

88. Because the overall deviation is less than 10%, the Plaintiffs have the burden to show that the redistricting plan evidences a "taint of arbitrariness or discrimination" in order to show it improper.[44] Otherwise, the City can rest on the rebuttable presumption that the apportionment between districts was the result of an "honest and good faith effort to construct districts...as nearly of equal population as practicable."[45]

89. The Plaintiffs in this case have presented no evidence to show that the City's redistricting plan was tainted with either arbitrariness or discrimination.[46] This dearth of evidence

---

[40] *Burns v. Richardson*, 384 U.S. 73, 92 (1966); *see also Chen v. City of Houston*, 206 F.3d 502 (5th Cir. 2000) (holding that city's use of total population rather than citizen voting-age population to measure population, in creating city council districts, did not violate Equal Protection Clause, despite a high number of non-citizen Hispanic residents).

[41] *Burns*, 384 U.S. at 92.

[42] *Fairley v. Patterson*, 493 F.2d 598, 602 (5th Cir. 1974).

[43] *Bodie v. City of Cleveland, Miss.*, 297 F. Supp. 2d 901, 905 (N.D. Miss. 2004).

[44] *Roman v. Sinock*, 377 U.S. 695, 710 (1964).

[45] *Reynolds v. Sims*, 377 U.S. 533, 577 (1964).

[46] *See Chen v. City of Houston*, 206 F.3d 502, 523 n.15 (5th Cir. 2000) ("[the court]" cannot say on this sparse record that a reasonable fact finder could find that the City's decisions here evidenced the 'bad

showing bad faith is true for both the redistricting plan itself as well as the decision to include students who reside in the dormitories on each college campus. Without evidence to establish bad faith on the part of the City, the Plaintiffs' claim of a violation of the one person, one vote principle is insufficient as a matter of law.

## **III. CONCLUSION**

Because the Plaintiffs have failed to establish that a third majority-African-American ward can be drawn that satisfies the traditional redistricting criteria, they cannot make out their *prima facie* showing under *Gingles*. And even if each of the *Gingles* preconditions were met, a review of the totality of the circumstances fails to show that the African-American minority group is deprived of an equal opportunity to participate in the City's political process. Finally, because the overall deviation between the ideal ward size and the actual ward size is under 10%, the City's plan does not violate the one person, one vote principle. No showing of bad faith or arbitrariness was presented by the Plaintiffs to show that the plan was discriminatory, even if it were numerically sound.

The voting patterns in the City of Hattiesburg still echo the effects of over a century of official discrimination. Citizens, both black and white, have not yet developed the degree of trust and respect for one another needed to overcome the City's fractured past. But the last ten years have witnessed remarkable progress by the African-American voters in the City to select representatives of their choice. And despite the unfortunate persistence of racial bloc voting and racially cohesive voting patterns, the City has achieved a remarkably equitable racial balance in each segment of the City's government. Although the Plaintiffs would undoubtedly like to see

---

faith, arbitrariness, or invidious discrimination' courts have required in cases involving variations under ten percent.")

even greater electoral successes by the African-American community of the City, those victories must be won strictly at the ballot box, as the City's plan violates no rights of the Plaintiffs that are recognized by this Court or that find a remedy under federal law.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the Plaintiffs' Complaint for relief is **denied**.

SO ORDERED AND ADJUDGED on this, the 7th day of August, 2008.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE